## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| KENNY LAI CHEONG, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>REALPAGE, INC., GREYSTAR REAL ESTATE PARTNERS, LLC, LINCOLN PROPERTY COMPANY, CUSHMAN & WAKEFIELD, INC, MID-AMERICA APARTMENT COMMUNITIES, INC., EQUITY RESIDENTIAL, MORGAN PROPERTIES MANAGEMENT COMPANY, CAMDEN PROPERTY TRUST, TRAMMELL CROW RESIDENTIAL, LLC,<br><br>*Defendants*. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Kenny Lai Cheong, individually and on behalf of all others similarly situated, brings this class action against Defendants RealPage, Inc ("RealPage") and lessors of multifamily residential real estate, including Greystar Real Estate Partners, LLC, Lincoln Property Company, Cushman & Wakefield, Inc, Mid-America Apartment Communities, Inc., Equity Residential, Morgan Properties Management Company, Camden Property Trust, and Trammell Crow Residential, LLC, (Together "Lessors", and collectively with RealPage, Inc, "Defendants") for entering into an unlawful agreement facilitated by RealPage's property management software platform to artificially inflate the price of multifamily residential property leases across the United States.

## I. Nature of Action

1.      This action arises from Defendants' conspiracy to fix, raise, maintain, and
stabilize rental housing prices throughout the United States. Plaintiff brings this action on behalf
of people injured by the effects of this conspiracy in the D.C. Metro Area. As used throughout
this complaint, the D.C. Metro Area is defined as the Washington-Arlington-Alexandria, DC-
VA-MD-WV Metropolitan Statistical Area, as established by the United States Office of
Management and Budget. The D.C. Metro area is centered around Washington, D.C. and is the
sixth largest metropolitan area in the United States as of the 2020 census.[1]

2.      RealPage is a software company that provides various services to Lessors,
including sending Lessors a daily list of prices for Lessors to price each of their units at.

3.      By using the RealPage software, Lessors shared a "massive repository of real time
lease transaction data, including prospect, renter, and property data" with RealPage. This data
includes non-public information about pricing (including unpublished starting rents and renewal
rent increases), inventory, occupancy rates, length of leases, units and unit types that are or will
be coming available to rent, and other confidential information about each of the apartments they
manage.

4.      The Lessors that used RealPage's AI Revenue Management software (previously
known as "YieldStar") agreed to "outsource daily pricing and ongoing revenue oversight" to

---

[1] The D.C., Virginia, and Maryland portions of the D.C. Metro area are known colloquially as the
DMV. The D.C. Metro Area includes the city of Washington, D.C.; the Virginia cities of
Alexandria, Arlington, and Reston; the Maryland cities of Bethesda, Frederick, Gaithersburg,
Rockville, and Silver Spring. *See, e.g.*,
https://en.wikipedia.org/wiki/Washington_metropolitan_area#/media/File:Dc22counties.jpg.

RealPage, with RealPage pricing participating Lessor's "properties as if we own them ourselves."

5.      RealPage runs its algorithms on its database of non-public competitively sensitive information it receives from the Lessors with the goal of "revenue optimization." RealPage then sends the Lessors the optimal price for each individual unit daily.

6.      Lessors adopt RealPage's price recommendations 80-90% of the time. This high rate of price adoption was important because as one RealPage employee explained "If you have idiots undervaluing, it costs the whole system." As one Lessor puts it, even though "we are all technically competitors," the software "helps us work together," "to work with a community in pricing strategies, not to work separately."

7.      RealPage is also able to leverage its database to assist Lessors with "Lease Expiration Management." By using RealPage's "enhanced" supply and demand forecasts, Lessors can structure lease lengths and renewal offers to "align expiration[] with market demands" so Lessors can keep "revenue front and center, and supply aligned with demand." Put another way, the software lets RealPage manipulate supply of rental units across competitors to maximize revenue for its customers.

8.      By managing supply in this fashion and agreeing to use RealPage prices, the Lessors were able to make more money. According to RealPage, participating Landlords experience "[r]ental rate improvements, year over year, between 5% and 12% in every market." One Lessor was able to generate an additional $10 million in revenue by increasing their turnover rate by 15 percentage points.

9.      Using RealPage allows the Defendants to increase their revenue even during market downturns. One Lessor was able to achieve a 4.1% increase in revenue during a down

market, and RealPage advertises that it enabled its customers to achieve "revenue lift between 3% to 7% in challenging cycles."

10.    In a marketing video, a RealPage vice president discussed the recent price increases for residential real estate leases, which were as high as 14.5% in some markets. When another RealPage executive asks: "What role has the [RealPage] software played" in those increases, the RealPage Vice President responded: "I think it's driving it, quite honestly."

11.    According to RealPage's most recent 10-K, RealPage estimates that a single multifamily unit generates approximately $500 in annual revenue for RealPage. Thus, RealPage presumably generates significantly more revenue than that for the Lessors to justify the cost of RealPage's software.

12.    RealPage admitted that their "solutions" were new to the Real Estate industry, which they claimed "historically lacked the tools available to many other investment classes." While they think the industry has reached a "relatively early stage of adoption," they believe there is "increasing demand" and the market for their software is "growing rapidly."

13.    Both vacancy rates and rental prices are increasing in the D.C. Metro area. For example, vacancy rates in D.C. hit a 25 year low in 2015 at 5.4%, but other than a small decrease as a result of the Covid eviction moratorium, have been rising since 2015, hitting 9.8% in 2021.[2] Rent has also increased with the average rent in D.C. increasing by about 14.5% from 2015 to 2021.[3]

_____

[2] Rental vacancy rate for the District of Columbia (2022) FRED. Saint Louis Federal Reserve. Available at: https://fred.stlouisfed.org/series/DCRVAC (Accessed: February 15, 2023).
[3] Alexander Hermann. (2022) Rents Have Soared Across the Country, But Home Prices Grew Even Faster | Joint Center for Housing Studies. Available at: https://www.jchs.harvard.edu/blog/rents-have-soared-across-country-home-prices-grew-even-faster (Accessed: February 15, 2023).

14.     Plaintiff and members of the proposed Class challenge an unlawful conspiracy under Section 1 of the Sherman Act. As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs paid supercompetitive prices for residential leases. Plaintiff brings this action to recover damages, trebled, as well as injunctive and other appropriate relief on behalf of all others similarly situated.

## II. Jurisdiction and Venue

15.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337,  as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

16.     This Court has personal jurisdiction over the Defendants because the Defendants either directly or through the ownership and/or control of their subsidiaries, inter alia: (a) transacted business in the United States, including in this District; (b) managed multifamily residential property leases throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and (d) were engaged in an illegal conspiracy to fix, raise, maintain, or stabilize rental prices and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. The Defendants also conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States.

17.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this

District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV. Parties

18.     Plaintiff Kenny Lai Cheong is a resident of Arlington County, Virginia. Mr. Lai Cheong has rented several residential units in the D.C. Metro Area that used RealPage's services including one managed by defendant Equity Residential. Mr. Lai Cheong has paid higher rental prices by reasons of the violations alleged herein.

19.     Defendant RealPage, Inc. is a Delaware corporation headquartered in Richardson, Texas. RealPage was a public company from 2010 until December 2020, when it was purchased by private equity firm Thoma Bravo in a transaction that valued RealPage at approximately $10.2 billion. RealPage provides software and services to the residential real estate industry, including the RMS described herein. RealPage has thousands of employees and earns over a billion dollars per year in revenue. As of December 31, 2019, RealPage had over 29,800 clients, including each of the ten largest multifamily property management companies in the U.S.

20.     Lessor Defendant Greystar Real Estate Partners, LLC ("Greystar") is a Delaware limited liability company with its headquarters in Charleston, South Carolina. Greystar is by far the largest manager of residential rental apartments in the country, with over 698,000 units under its management, including approximately 99 properties in the D.C. Metro Area.

21.     Lessor Defendant Lincoln Property Company ("Lincoln") is a Texas corporation with its headquarters in Dallas, Texas. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm, including multiple properties in the D.C. Metro Area.

22.     Lessor Defendant Cushman & Wakefield, Inc. ("Cushman & Wakefield"), is a Delaware corporation headquartered in New York, New York. It is the third largest commercial real estate services firm in the world. Its subsidiary, Pinnacle Property Management Services, LLC ("Pinnacle") is headquartered in Addison, Texas. Cushman and Wakefield as well as Pinnacle owns and operates apartment buildings around the country, including approximately 20 properties in the D.C. Metro Area.

23.      Lessor Defendant Mid-America Apartment Communities, Inc. ("MAA") is a Tennessee corporation with its headquarters in Germantown, Tennessee. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm including multiple properties in the D.C. Metro Area.

24.     Lessor Defendant Equity Residential is a Maryland real estate investment trust with its headquarters in Chicago, Illinois. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm, including approximately 47 properties in the D.C. Metro Area.

25.     Lessor Defendant Morgan Properties Management Company, LLC is a Georgia limited liability company headquartered in King of Prussia, PA. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm including approximately 6 properties in the D.C. Metro Area.

26.     Lessor Defendant Camden Property Trust ("Camden") is a Texas real estate trust with its headquarters in Houston, Texas. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm including approximately 16 properties in the D.C. Metro Area.

27.     Lessor Defendant Trammell Crow Residential, LLC ("Trammell Crow") is a Delaware limited liability corporation headquartered in Dallas, Texas. Trammell Crow has developed over 265,000 multifamily units including multiple properties in the DC Metro Area. Trammell Crow is one of RealPage's clients and uses its revenue management software.

28.     Additionally, there are co-conspirators, including multiple multifamily apartment management companies, known and unknown to Plaintiff and not named as defendants in this action, who have participated as co-conspirators in the offenses alleges and have performed acts and made statements in furtherance of the conspiracy.

### V. Factual Narrative

#### A.  RealPage

29.     RealPage is a software and data analytics company that provides a variety of services to the real estate industry. RealPage was founded in 1998 with the acquisition of a company called Rent Roll Inc., who provided on premise property management systems for multifamily housing properties.

30.     RealPage piloted its YieldStar systems with Camden Property Trust around 2005. Jeffrey Roper, at the time the president of M/PF YieldStar, described the software: "YieldStar enables you to quickly identify opportunities where you are underpricing or threats where you are overpricing a particular floor plan. It's a powerful tool for optimizing rental revenue for both stable and lease-up properties, using advanced market response and forecasting models to make daily rent recommendations. It also recommends optimal new and renewal floor plan and unit-level rents that consistently maximize revenue."

31.     Roper had previously been the Director of Revenue Management at Alaska Airlines when it and other airlines began using common software to share nonpublic planned

routes and prices with each other in the 1980s. The Department of Justice estimated that the agreement cost customers over a billion dollars and reached settlements or consent decrees for price-fixing violations with eight airlines, including Alaska Airlines. Roper said, "We all got called up before the Department of Justice in the early 1980s because we were colluding . . . We had no idea."

32.     In their own promotional materials, RealPage highlights the similarities between their software and the airline industry's software. They admit their revenue management technology "is similar to revenue management approaches that were originally adopted by the airline industry."

33.     RealPage has expanded aggressively and has completed over 50 acquisitions since 2002 including the acquisition of competitor Lease Rent Options ("LRO") in 2017 for $300 million. When this deal happened, it was reviewed by the federal government, and even Roper admitted that "I was surprised the DOJ let that go through."

34.     LRO was another revenue management company that "optimized pricing for over 1.5 million apartments." RealPage highlighted the reasons that it acquired LRO. It wanted to expand "the company's real-time lease transaction data" and acquire additional "data science talent and data modeling tools that allow for better harvesting and placement of capital in the rental housing industry."

35.     This rapid expansion has been successful. RealPage's total revenue grew from $869 million in 2018 to $1.158 billion in 2020. By 2020, the top ten property management firms in the United States all used RealPage's software.

36.     RealPage was acquired by private equity firm Thoma Bravo for $10.2 billion in December of 2020. As a result of the acquisition, RealPage became a privately held company and was delisted from the Nasdaq stock exchange.

### B.   The Traditional Model for Pricing in Multifamily Real Estate Leases

37.     Traditionally, Lessors would set their prices independently with the goal of maximizing occupancy. This strategy of offering discounted rates in order to "keep[] the heads in the beds" is normal behavior in a competitive marketplace. If they did not compete on price, other firms would undercut their prices and take market share.

38.     The reason that firms were competing on price was simple. Their rental properties are effectively a perishable good. Any day that a unit sits open is a day of lost rental income that the Lessor will never recover.

39.     Lessors would set prices "manually" and would "typically" conduct phone surveys of competitors and try to determine market rates in order to set their own rates. Lessors, however, would not know the precise details of their competitors pricing or discounts.

### C.   RealPage Disrupted the Traditional Model

40.     The introduction of RealPage allowed this strategy to change. Implementing RealPage's YieldStar technology at a property in Houston allowed Morgan Group to grow revenue 5 percent above their expectations, leading one of their senior vice presidents to say: "My generation grew up worshipping the occupancy gods. We learned that if you were not 95

percent-plus occupied, the asset was failing. But that's not necessarily true anymore. This totally turns the industry upside down."[4]

41.      As one industry participant explains, with the introduction of revenue management algorithms, strategies have shifted. "Now, rent growth and occupancy are co-equals."

42.      RealPage stresses the importance of this new strategy. "One common misconception managers believe is that if they are full, they are doing great.  Lesson one is to learn the difference between physical and economic occupancy. Buying occupancy with concessions, lower rental rates, and maintaining the lower rates at renewal drive the value of an asset down." Instead of focusing on market share and volume, the new market trend is to maximize "economic occupancy" or "revenue optimization."

43.      RealPage has provided the defendant Lessors a way to combat this natural prisoner's dilemma. Instead of competing with each other on price, Lessors "outsource [their] daily pricing and ongoing revenue oversight" to RealPage, with RealPage pricing participating Lessor's "properties as if we [RealPage] own them ourselves."  RealPage is in effect setting prices as a monopolist for all the Defendant Lessors.

44.      A RealPage customer echoed this sentiment, "By outsourcing to YieldStar, we've got a team of multifamily experts handling revenue management for us, who essentially act like an extension of our team." This dynamic is problematic because economic theory states that as the concentration of real estate ownership increases, the associated rents for those units increase.[5]

---

[4] Bousquin, J. (2009) In the back office, Revenue Management software is causing a revolution. Available at: https://www.multifamilyexecutive.com/technology/in-the-back-office-revenue-management-software-is-causing-a-revolution_o (Accessed: February 8, 2023).
[5] Watson, C.L. and Ziv, O. (2021) Is the rent too high? Land Ownership and Monopoly Power, SSRN. Available at:

Since RealPage is pricing all of these units as if they own the units themselves, it allows the Lessor defendants to increase rents without sacrificing market share.

### D. Lessor Defendants Shared Non-Public Competitive Information with RealPage

45.     Lessors have agreed to send RealPage real-time lease transaction data for over 19.7 million units. RealPage uses this "massive repository of real time lease transaction data, including prospect, renter, and property data" to power its algorithms.  This database is a collection of nonpublic competitively sensitive information.

46.     Lessor defendants shared a variety of non-public competitively sensitive information with RealPage, including about pricing (featuring unpublished starting rents and renewal rent increases), inventory, occupancy rates, length of lease, units and unit types that are or will be coming available to rent, and other confidential information about each of the apartments they manage.

47.     Even though RealPage claims that it only shares aggregated data with its customers, by using "competitor rent data" as one of the inputs into the price setting algorithm, RealPage is utilizing the sensitive information to set prices for the Lessor defendants. It is thus irrelevant if Lessor defendants can see the individualized information being shared with RealPage as RealPage has access to the individual information and is setting the prices.

48.      The usage of RealPage's software increased over time and RealPage aggressively acquired competing software and databases that further expanded RealPage's information database.

---

https://deliverypdf.ssrn.com/delivery.php?ID=548111106089088067018099124073067027021025063038087091093125116125006115094074002111018037122016015026027065105110000110125097118045047033052120123122106083006074079008008014026028075071114002082108123115100025005114093115084119119121077106117083005124 (Accessed: February 14, 2023).

49.     According to RealPage, this database is unique and gives them an advantage over other revenue management solutions. They advertise that "no other revenue management solution has the depth or quality of connected intelligence." This allows them to create "enhanced" supply and demand forecasts.[6]

### E.   RealPage Used This Data to Set Prices

50.     After collecting nonpublic information from Lessor Defendants, RealPage runs the massive dataset through its pricing algorithm, which outputs suggested prices for participating Landlords through application of a common formula to a common dataset.

51.     Not only does RealPage set pricing for the Lessors, but it also monitors all of the participants to ensure that they are pricing correctly. While RealPage claims that the participating Lessors cannot see individual competitor pricing, they can see data on how competitors within a certain geographic distance are priced. In some cases, they can narrow it to buildings within a half mile radius of their units. RealPage also reviews pricing daily or weekly with on-site management, and monitors and reports on weekly rents, occupancy levels, and revenue trends. By seeing the real-time lease transaction data, RealPage can successfully monitor all of its customer's pricing.

52.      For the system to work, the defendants need all the participants to follow RealPage's pricing recommendations. As one RealPage employee admitted "If you have idiots undervaluing, it costs the whole system."

53.     RealPage admits that its algorithm cannot consider every potential factor that might alter the price of an apartment. They tell potential customers that "it is both common and

---

[6] Apartment Revenue Management Software, RealPage. Available at: https://www.realpage.com/asset-optimization/revenue-management/ (Accessed: February 8, 2023).

expected that over time an apartment provider will follow the system's pricing recommendations on approximately 80-95% – not 100% – of its pricing decisions."

54.     Specifically, every morning, RealPage provides participating Landlords with recommended price levels. This is done through a RealPage "Pricing Advisor." Landlords then let the "Pricing Advisor" know that they have "accept[ed]" or "confirm[ed] the "approved pricing" within a specified time frame. If Landlords wish to diverge from the "approved pricing" they must submit reasoning for doing so and await approval. RealPage encourages participating Landlords to have daily calls between the Landlords' employees with pricing responsibility and the RealPage Pricing Advisor.

55.     According to RealPage, one of its selling points is that it gives leasing agents the confidence to raise prices, even when there are vacant units. One RealPage employee even admitted that "we said there's way too much empathy going on here. This is one of the reasons we wanted to get pricing off-site."

56.     After installing LRO, a competitor revenue management software that RealPage has since acquired, Equity Residential's CEO was quoted as saying "We've raised rents hundreds of dollars in some markets and I don't think the people onsite, given the way we'd trained them to think about pricing, would have had the courage to push it as aggressively as this program has."

57.     The president and COO of a competitor who used RealPage's YieldStar, Camden Property Trust, agreed. "It's not in their DNA to raise pricing $150 to $200 per unit on a lease turn".

58.     Being this aggressive with pricing can increase turnover. Camden Property increased its turnover rates by 15 percentage points after implementing the software. Despite

having to find many new renters, revenue grew 7.4%. In an interview with a trade publication after this, the CEO said "The net effect of driving revenue and pushing people out was $10 million in income. I think that shows keeping the heads in the beds above all else is not always the best strategy."

### F.   RealPage Also Allowed Lessors to Manage Supply Levels Across Competitors

59.      This increased turnover also allowed RealPage to implement another strategy that helps maintain the collusive price levels. RealPage offers a pricing matrix that gives different monthly rents depending on the length of the lease or renewal. This gives Lessors a tool that they could use to help break up periods of natural oversupply by giving financial incentives to renters to end their lease at a period of lower available supply. This enables the Lessors to charge a higher rent on that Lessee's next rental contract.

60.      As RealPage explains "As lease expirations approach, revenue management helps design renewal pricing appropriate to the actual lease expiration's future date and seasonality, ensuring that the optimal price for each lease expiration is captured and turnover reduced." RealPage admits that their software designs renewal and extension offers in order to create vacancies at times that will maximize revenue.

61.      RealPage highlights this as a priority: "It's important to maximize revenue but equally important to position all expirations to expire in the best possible months by alignment of supply and demand, the cornerstone of revenue management in achieving optimal rent." RealPage's revenue management software enables the Defendants to manage supply across competitors, thanks to the sharing of detailed lease information, in order to maximize the revenue that Lessors can generate from each new lease.

**G.   The Cooperation between RealPage and the Lessors Resulted in Anticompetitive Pricing and Reduced Occupancy.**

62.    In a presentation in the summer of 2021, Jay Parsons, a vice president at RealPage, was discussing a recent hike in rents of 14.5%. He said "Never before have we seen these numbers." He asked a colleague of his, Andrew Bowen, what role the RealPage software had on these numbers. Bowen admitted "I think its driving it, quite honestly. As a property manager, very few of us would be willing to actually raise rents double digits within a single month by doing it manually."

63.    Lessors seem to agree. One Lessor claimed that "The beauty of YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it." And another Lessor commented that, "[i]n our Florida markets, we let the system push as hard as it would go, and we saw increases as high as 20 percent ... Left to our own devices, I can assure you we would have never pushed rents that hard. That was a big number."

64.    Greystar reported that their buildings that utilized YieldStar outperformed the market by 4.8% during an economic downturn.

65.    RealPage advertises that its services provide Lessors "rental rate improvements, year over year, between 5% to 12% in every market," the ability to "outperform the market by up to 5%," and "drive up to an additional 150-200 basis points of hidden yield." Furthermore, RealPage claims to "outperform manual pricing" by 7 percent each year. That is, the Lessors' collusion succeeds in increasing prices above competitive levels by 7 percent each year.

66.    RealPage also explains how it can achieve these results. RealPage states that "We believe in overseeing properties as though we own them ourselves" and "We believe we can

16

deliver better results for you than you would otherwise be able to achieve."[7] By acting as if it owns the participating Lessor's properties, RealPage is able to achieve supracompetitive results that the Lessors "would not otherwise be able to achieve" alone.

67.     The Covid-19 pandemic is a prime illustration of Lessors' ability to coordinate pricing through RealPage and achieve market outcomes untethered to what one would expect if Lessors were acting independently of one another. A RealPage Vice President of Revenue Management explained that "at the start of Covid, I think a lot of our [Lessors'] initial reaction, was, 'oh I need to start dropping rent, I need to start giving concessions'" to account for the exodus of renters from major metropolitan areas. But "our [RealPage's] advisory team and the product did a great job" of resisting that natural competitive outcome. Another RealPage employee agreed with that assessment, noting "we just saw unbelievable resilience and I would say discipline in pricing through the worst of the downturns . . . a lot of people thought we'd see severe rent cuts; that just didn't happen." That "resilience" and "discipline" is "unbelievable" precisely because absent assurances that competitor Lessors are not going to undercut a given Lessor on price, such discipline is against the Lessor's individual economic self-interest.

**H.   The Structure and Characteristics of the Real Estate Market, Together With Other Factors, Make it Susceptible to Collusion**

*1.The Market for MultiFamily Residential Property Leases*

68.     The relevant product market is the market for the lease of multifamily residential properties and the relevant geographic market is the D.C. Metro Area.

---

[7] Renewal Reporting – Medve. RealPage. Available at: https://medve.com/assets/airm-renewal-reporting.pdf (Accessed: February 8, 2023).

69.     The market for leasing multifamily residential properties in the D.C. Metro Area is distinct from the market for the purchase of residential real estate such as apartments, condominiums, or houses. These products are not economic substitutes because purchasers of residential real estate need the ability to make a substantial down payment and obtain financing.

70.     Leases from single-family properties are also not an economic substitute for leases of multifamily properties. Multifamily homes and single-family homes offer different amenities and are treated as distinct markets by industry participants, including RealPage.

71.     Geographically, given that commuting distance to a place of work or school is a significant (if not the primary) geographic constraint on where a person chooses to live, renters in the D.C. Metro Area do not consider multifamily residential leases in other metro areas as adequate substitutes for multifamily residential leases in the D.C. Metro Area, because the daily commute would take multiple hours in each direction.

### 2. "Plus Factors"

72.     The market for the sale of multifamily residential leases is characterized by numerous "plus factors" that render the industry susceptible to collusion, such that the formation, maintenance, and efficacy of a cartel is more likely. These include (1) high barriers to entry, (2) inelastic consumer demand, (3) market concentration, (4) exchanges of competitively sensitive information among horizontal competitors, (5) numerous opportunities to collude at trade associations and RealPage functions, (6) relative fungibility of residential real estate leases.

### (a) High Barriers to Entry

73.     Typically, in a market where market participants are colluding to generate supra-competitive prices, the excess profits generated would incentivize competitors to enter the market and drive prices down. However, in markets where there are high barriers to entry, like

the market for multifamily homes, new competitors are less likely to enter the market. Thus, entry barriers help to facilitate the formation and maintenance of a cartel. Multifamily residential real estate properties owners and operators face significant entry barriers, such as high maintenance costs, regulatory compliance, high acquisition costs, labor costs, high construction costs, and high cost of acquiring property and establishing a property management infrastructure. Even small multifamily rental properties cost millions of dollars to acquire. Large properties, such as those operated by Greystar, run into the hundreds of millions of dollars to own and manage. They take several years and significant experience to build or acquire. Thus, new entrants into the residential real estate leasing market are unlikely to discipline cartel pricing.

### (b) Inelastic Consumer Demand

74.      "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

75.      The demand for multifamily residential property leases is relatively inelastic. Renters of multifamily units can turn to either single family homes, which are typically more expensive and offer different amenities, or can purchase residential real estate. Purchasing has significant barriers which typically include a large down payment and access to financing.

19

### *(c) Market Concentration*

76.     The market for multifamily residential real estate has become increasingly owned by large institutional investors in the last two decades. For example, "while about a third of properties with 5 to 24 units were owned by non-individual investors in 2001, that share soared to 47 percent in 2012 and about two-thirds in 2015. Similarly, about 66.1 percent of properties with 25 to 49 units were owned by institutional entities in 2001, which rose to 77 percent in 2012 and about 81 percent in 2015." For the largest buildings, with 50 or more units, institutional investors increased their ownership from 86.9 percent to 92.3 percent.[8]

77.     Over 31,700 customers used RealPage as of their last public filing with the SEC in 2020. These customers used RealPage software to manage approximately 19.7 million rental real estate units.  This client list included "each of the ten largest multifamily property management companies in the United States, ranked as of January 1, 2020 by the NMHC, based on number of units managed."

### *(d) Exchanges of Competitively Sensitive Information Among Horizontal Competitors*

78.     RealPage's participating Lessors, directly and using RealPage as a conduit, share competitively sensitive information with one another. Founder and former CEO Steve Winn has noted in earnings calls that RealPage's numbers "give a much more accurate view of what's happening in the market compared to merely looking at rents reported by Internet listing services or other sources." In addition to its price-setting and lease renewal-staggering services, RealPage collects non-public data on multifamily residential real estate properties and creates

---

[8] Hyojung Lee. (2017) Joint Center for Housing Studies. Available at:
https://www.jchs.harvard.edu/blog/who-owns-rental-properties-and-is-it-changing (Accessed:
February 8, 2023).

benchmarking reports that allow for quick comparisons of a Lessor's performance on occupancy and price for similar property classes vis-à-vis the industry.

### (e) Relative Fungibility of Residential Real Estate Leases.

79.     Leases of multifamily residences are a relatively fungible product, particularly when it is divided between classes of properties. Once high-level variables, such as number of bedrooms and bathrooms, location, square footage, and amenities, are controlled for, properties within those classes are relatively interchangeable to prospective renters.

### 8. Numerous Opportunities to Collude

80.     RealPage interacted with the Lessor Defendants regularly and facilitated cooperation between the Lessor Defendants.

81.     RealPage created a private RealPage User Group Forum, which was an association with over a thousand participating Lessors. The goal of this group according to RealPage, is to "to improve communications between RealPage and the user community," and "promote communication between users" themselves. The Forum contains an "Idea Exchange," where Lessors submit their own recommendations for changes or improvements to RealPage's offerings, as well as comment on proposed changes to RealPage's software.

82.     Additionally, RealPage has several subcommittees composed of customers. The committee members attend a quarterly conference call and meet in person annually at the RealWorld Conference that RealPage sponsors. One of these subcommittees is focused on Revenue Management specifically.

83.     RealPage admits that the by joining the User Groups that "our members make new contacts in the industry" and that the purpose is to "improve communications between RealPage and the user Community, and to promote communications between users."

84.     RealPage sponsors an annual conference called RealWorld. This conference allowed customers to "engage in face-to-face networking, build partnerships in the Hall of Solutions, attend informational breakout sessions and participate in exclusive, in-person content." They have held conferences in Las Vegas, Nashville, Orlando, and a virtual conference due to Covid over the last few years.

85.     Industry trade associations offer RealPage and participating Lessors additional opportunities to conspire. As an illustrative example, the National Multifamily Housing Council ("NMHC"), which advertises itself as "the place where the leaders of the apartment industry come together to guide their future success," holds several events every year, including in person "Apartment Strategy Conference," an "Annual Meeting," a "Fall Meeting," hosted in cities including San Diego, CA, Las Vegas, NV, and Washington, DC. NMHC counts among its "Chair's Circle Sponsors" RealPage, Greystar, and more participating Lessors. Of note, NMHC "tracks market conditions through NMHC member surveys as well as data from data provider partners," to provide "industry benchmarks" on topics including "In Place Rent Per Square Foot," "Rent Change – New Leases," and "Rent Change – Renewals."

### VI. Call for an FTC investigation and Reported DOJ investigation

86.     On November 1, 2022, Senator Sherrod Brown, Chairman of the Senate Committee on Banking, Housing and Urban Affairs urged FTC Chair Lina Khan to investigate the use of price optimization software.  He wrote:

> I write to urge the Federal Trade Commission (FTC) to review the current use of price optimization software employed by property owners to set rents. According to recent reports, the collection and use of rent data in price optimization software is allowing for anticompetitive and potentially unlawful collusion among competitors at the expense of consumers.
>
> In 2017, RealPage, a provider of price optimization software, acquired their main competitor, Lease Rent Options from The Rainmaker Group. This $300 million acquisition

resulted in RealPage becoming the dominant provider of this price optimization software. Since then, rental housing market concentration has increased and RealPage's influence has only grown.

Alarmingly, recent reporting by ProPublica highlighted that RealPage's algorithm-based price optimization software, YieldStar, is being used by a growing number of property managers and landlords, potentially impacting pricing and the supply of homes in the rental market. This software uses data analytics to suggest rent prices to landlords on a day-by-day basis, with the clear-cut purpose of maximizing revenue. RealPage reported to the Securities and Exchange Commission that as of 2020, they helped manage the operations of millions of units and that their clients, who use one or more of their software products, included the nation's ten largest multifamily property management companies.

87.     Senator Amy Klobuchar, the chair of the Senate Subcommittee on Competition Policy, Antitrust, and Consumer Rights, wrote a letter to the Department of Justice asking for an investigation into Real Page. The letter reads in part "We are concerned that the use of this rate setting software essentially amounts to a cartel to artificially inflate rental rates in multifamily residential buildings" and urged the DOJ to "take appropriate action to protect renters and competition in the residential rental markets."[9]

88.     According to reporting by ProPublica, the Department of Justice's Antitrust Division has responded by opening an investigation into whether RealPage helped landlords coordinate rent increases.[10]

## VII. Class Action Allegations

89.     Plaintiff brings this action on behalf of himself, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

---

[9] *See* Vogell, H. (2022) Sen. Amy Klobuchar asks DOJ to look into RealPage. ProPublica. Available at: https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent-klobuchar (Accessed: February 14, 2023).
[10] Vogell, H. (2022) The DOJ has opened an investigation into RealPage. ProPublica. Available at: https://www.propublica.org/article/yieldstar-realpage-rent-doj-investigation-antitrust (Accessed: February 14, 2023).

All persons or entities in the D.C. Metro Area that directly leased one or more multifamily residential units from a Lessor Defendant, or from a division, subsidiary, predecessor, agent, or affiliate of such Lessor Defendant that used RealPage pricing software and/or lease renewal staggering software programs from February 17, 2019 until the anticompetitive effects of Defendant's unlawful conduct ceased.

90. This case is properly brought as a class action under Rule 23(a) for the following reasons:

    a.   Numerosity: The Class is so numerous that joinder of all members in this action is impracticable. The exact number an identity of all Class Members is unknown by plaintiff at this time. However, plaintiff believes there are millions of Class Members. The number and identity of Class Members can be determined through discovery.

    b.   Commonality and Predominance: Plaintiff and all Class Members were all injured by the same unlawful conduct, which resulted in all of them paying more for multifamily residential leases than they otherwise would have in a competitive market. Therefore, there are common questions of law and fact shared by the class which predominate over any questions that might affect particular Class Members.

    c.   Typicality: Plaintiff's claims are typical of those of the Class. Plaintiff's injury has been caused by the general unlawful conduct of defendants which would provide the same basis for a claim for all Class Members.

    d.   Adequacy of Representation: Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are not antagonistic to the Class. Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

91. Questions of law and fact common to the Class include:

a.   Whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate price and/or artificially suppress supply of multifamily residential real estate leases from competitive levels;

b.   If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the per se, quick look, or rule of reason modes of analysis;

c.   If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply of multifamily residential real estate leases from competitive levels;

d.   The proper measure of damages; and

e.   The appropriate injunctive and related equitable relief for the Class.

92.   Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII. Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act

93.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

94.   Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

95.     Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in the sale of multifamily residential real estate leases.

96.     Specifically, Defendants combined to coordinate multifamily residential housing rental prices and supply across the United States and exchanged non-public and competitively sensitive information with one another in order to accomplish that purpose.

97.     Defendants' conduct was undertaken with the intent, purpose, and effect of artificially inflating rental prices above the competitive level, including through manipulation of housing supply; eliminating or constraining price competition between and among the Lessor Defendants with respect to leases for their multifamily residential housing stock; and coordinating the supply of multifamily residential housing between and amongst the Lessor Defendants.

98.     Plaintiff has suffered damages and continue to suffer damages due to the supra-competitive rental prices for multifamily residential leases charged by defendants.

99.     The defendant's conduct is a per se violation of the federal antitrust law or, alternatively, unlawful under either a quick look or rule of reason analysis.

## IX. Prayer for Relief

100.     Plaintiff petitions for the following relief.

a.  A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed class representatives, and that Plaintiffs' counsel be appointed as class counsel.

b.  A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act under either a per se, quick look, or rule of reason mode of analysis.

c.  Plaintiff and members of the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgments in favor of Plaintiff and members of the Class be entered against Defendants in an amount to be trebled to the extent that relevant laws permit.

d.  A judgment enjoining Defendants from engaging in further unlawful conduct.

e.  An award of attorneys' fees and costs.

f.  An award of pre- and post-judgment interest on all amounts awarded; and

g.  Such other relief as the Court deems just and equitable.

## X. Jury Trial Demanded

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all triable issues.

Dated:          February 17, 2023                    Respectfully submitted,

/s/ *Christopher Le*
**BOIES BATTIN, LLP**
Timothy D. Battin (VSB No. 34924)
Christopher V. Le (VSB No. 75113)
4041 University Drive, 5th Floor
Fairfax, VA 22030
Telephone: (703) 764-8700
tbattin@boiesbattin.com
cle@boiesbattin.com

*Counsel for Plaintiff Kenny Lai Cheong and the Proposed Class*